In re C.W. NORMAN, Debtor.

Grover D. BARNETT, Mary F. Barnett, & The Federal Land Bank of New Orleans, Plaintiff,

v.

Clayton Welton NORMAN and Earl Gillian, Jr., Trustee Defendants.

Earl GILLIAN, Jr., Trustee, Plaintiff,

v.

ALABAMA NATIONAL BANK, CONOCO, INC., State of Alabama, Department of Revenue, Defendants.

Bankruptcy No. 82–01341.
Adv. Nos. 83–0175, 83–0200.

United States Bankruptcy Court,
M.D. Alabama.

Jan. 26, 1984.

John B. Scott, Jr., Montgomery, Ala., for plaintiff.

E. Terry Brown, Montgomery, Ala., trustee.

Von G. Memory, Montgomery, Ala., for Conoco Inc.

## OPINION ON ORDER REQUIRING ACCOUNTING

## OPINION ON MOTION TO REVIEW CONVEYANCE OF REAL ESTATE TO SWANEE RIVER PECAN, INC. AND FOR OTHER RELIEF

RODNEY R. STEELE, Bankruptcy Judge.

This Opinion and Order concern an accounting of trustee's sale of debtor's real property. The accounting is at the instance of the Court by an Order of December 29, 1983, and upon the motion filed by Conoco, Inc., to review the conveyances and to have an accounting.

The sale occurred on December 7, 1983, and was of five parcels of land to Swanee River Pecan, Inc. for $340,000.00.

The trustee in April of 1983, filed his complaint to sell these properties free and clear of encumbrances; the Court authorized such a sale, and has since that time monitored the progress of the proposed sales.

When the sale was consummated, a hearing was held on December 28, 1983. The attorneys for Alabama National Bank and for Conoco, Inc. protested that a proper accounting had not been made of the sale, and in one instance that moneys had been improperly paid to the real estate broker who arranged for the sale.

The accounting took place on Friday, January 20, 1984.

Present at that time were all of the persons who were required by the Order of the Court to appear, who brought with them the books and documentation relating to the closing of the sale.

The attorney for Conoco examined the trustee, Mr. Roy Mason, a prospective purchaser who had ultimately assigned his contract for purchase to Roy Hodges and others, and Mr. W.R. Fowler, the real estate broker.

The Court examined all of the documentation provided, including the statement of sale of the trustee, the statement of expenses and time of the title attorney for trustee, the statement of receipts and disbursements by the trustee, and the closing statement filed by the attorneys for the lending agency, the Alabama National Bank of Montgomery.

### FINDINGS & CONCLUSIONS

■ The disbursements made and questioned in this case by Alabama National Bank and Conoco, Inc., fall into these categories:

1) Taxes: The Court finds and concludes that the taxes which were paid by the trustee from the proceeds of this sale were taxes which were liens under Alabama law, and were required to be paid as taxes in

arrears, prorated upon a sale. There is no evidence that these taxes were irregular, or were not owed. They were verified either by the trustee or by his title attorney.

2) The payment of mortgages, with attorneys fees for mortgage holders.

a) The mortgages held by persons represented by Mr. Tom McGregor, Attorney at Law, and paid by checks No. 135 and 136 of the trustee, were verified to the trustee by Mr. McGregor, as was the amount of interest owed on those mortgages. In addition, Mr. McGregor was paid a fee of approximately 10% of the balance due on these mortgages, which was authorized by the mortgage, and was payable as a part of the mortgage expense, and did not include the interest and insurance to which those mortgage holders were entitled. We conclude that these charges were justified under Title 11, U.S.C., Section 506(b).

b) Mortgages held by the Federal Land Bank of New Orleans and by Grover C. Barnett were paid by checks No. 139 and 140. Trustee testified that he was kept up to date on the amount of interest by the attorney representing these two mortgage holders, and was satisfied of the correctness of those interest payments. The attorney for these two mortgage holders, Mr. John B. Scott, was paid by check No. 141 for his services on behalf of these mortgage holders in an amount which is approximately 2% of the amount which he recovered for his clients, and the Court finds these amounts paid reasonable and necessary under Title 11, U.S.C., Section 506(b).

c) A mortgage to Real Estate Finance Company was paid by check No. 142, and the trustee testified that he had been kept up to date by the attorney for Real Estate Financing as to the amount of interest. It does not appear that any attorney's fees were added to this amount. The Court finds this a reasonable and necessary payment under Section 506(b).

d) A mortgage to Roy Mason was paid by check No. 143, in the amount of $4,971.58. Some controversy arose over this mortgage payment, but the mortgage was a mortgage of record, and trustee had been advised that Mason had been paid; however, Mason testified, and so did the trustee, that the mortgage was unsatisfied of record, and that Mr. Mason declined to satisfy unless and until he was paid. The debtor in this case, Clayton Welton Norman, has been uncooperative, and has suffered a stroke, which prevents the trustee from obtaining accurate information as to the payment. In addition, there are no books and records available to disprove or discredit the claim of Mason under this mortgage. The Court concludes that the trustee was obliged to satisfy the mortgage in order to clear the title, and that this payment is justified under Section 506(b).

3) Some question concerning the trustee's settlement with Grover D. Barnett, growing out of a preference suit, which settlement was in the amount of $21,000.00, was apparently explained to the satisfaction of creditors. It appears that trustee was able to reach settlement with Barnett, concerning certain personal property which trustee asserted Barnett had received as a preference. As an accommodation to Barnett, the trustee agreed to wait upon payment of this $21,000.00 until the closing in this case on the five parcels of realty. This money, which was offset against what was owed to Barnett on his mortgage, goes directly into the general estate of this bankrupt. It cannot be accounted as a reduction or other credit in disposing of mortgages and judicial liens in the sale of this property. It is a separate and unique claim, not associated with the real estate or the closing in this case.

4) Expenses of the trustee in closing: The trustee was obliged to pay for abstracts from Autauga County and from Montgomery County, Alabama (checks No. 133 and 134), and no question has arisen about these payments. He was required, moreover, to pay some additional taxes on property which had been sold (check No. 107), and there is no question about this disbursement.

Some question did arise concerning the fee paid to the trustee's title attorney, Mr.

Lanier Branch, in the amount of $3,310.15. That amount has not yet been paid, and the examination by the Court, and the examination of his time charges and services rendered and expenses involved by the creditors, leads the Court to conclude that there is no question about the title attorney's fee. He was examined concerning his hourly rate, at $90.00 per hour, and he represented to the Court that his usual fee is $95.00 per hour for these services, and that considerable time was required in bringing the abstracts to date and examining them on five separate parcels of property.

The Court concludes that Mr. Branch's time charges for title work ought to be approved and paid.

An additional item was title insurance, which is an expense of the trustee, in the amount of $805.00, and the parties to this hearing agreed that it was an established fee which had to be paid.

## THE REALTOR'S FEE

For separate treatment, we have reserved the amount paid by the trustee to Bill Fowler Realty Company in the amount of $20,400.00. The creditor, Conoco, critically examined Mr. Fowler concerning his fee, and his connections with the purchaser in this case.

█ And we must conclude that the fee paid to Mr. Fowler as realtor ought to be refunded by the purchaser and by Mr. Fowler.

Mr. Fowler was paid with check No. 144 of the trustee, in the amount of $20,400.00.

It appears, however, that Mr. Fowler, or Bill Fowler Realty Company, his individual proprietorship, has run afoul of the provisions of Title 11, U.S.Code, Section 328(c).

That Section provides as follows:

(c) Except as provided in Section 327(c), 327(e), or 1107(b) of this Title, the Court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under Section 327 or 1103 of this Title, if, at any time during such professional person's employment under Section 327 or 1103 of this Title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

## FINDINGS

1. The trustee applied for the appointment of Bill Fowler Realty Company on July 1, 1983. On July 8, 1983, the Court entered an Order approving the employment of Bill Fowler Realty under Title 11, U.S.C., Section 327.

2. Thereafter, Mr. Fowler arranged for a contract of sale between the trustee and Roy R. Mason, on July 11, 1983. The contract provided for sale of five parcels of land for $340,000.00.

3. Mr. Mason later concluded that he would not be able to go through with the arrangement, and gave notice of termination under the contract. The contract was then assigned to Roy Hodges, and another, upon the same terms and conditions.

4. Paragraph 6 of that contract provides:

6. It is anticipated that purchaser will assign and transfer his rights under this contract to a corporation or another entity in which Roy R. Mason and Bill Fowler are the beneficial owners, and that such sale will be consummated by such corporation or entity. Purchaser shall have the right to assign this contract.

5. The trustee was required, through his attorneys, and through Bill Fowler himself, to correct certain title defects and to satisfy the purchaser concerning certain defects of title. These were accomplished, and in October, the parties planned a closing date.

6. In October, according to Mr. Fowler, he reached an agreement or an arrangement with Hodges in which they were to organize a corporation, known as Swanee River Pecan, Inc., which was to take title to all of this property. Bill Fowler was a 50% owner. The corporation was organized shortly before the closing of the real estate

**12**

transaction. On December 7, 1983, then Mr. Fowler was a 50% owner of the purchaser.

7. Mr. Gillian testified that he knew Mr. Fowler was involved in business with Mr. Hodges, and that under the terms of the contract he could be interested in the corporation which would take title to the property.

The trustee also testified, however, that Bill Fowler had never told him that he would have a beneficial interest in the property which he was selling, and that he understood up to the time of the closing, that Bill Fowler would be interested in this property in two ways with Mr. Hodges through Swanee River Pecan Corporation: the first was as a manager of the pecan grove, occupying some 147 acres of this property; the second was a realtor in selling or leasing this property, or some of it, for the purchaser.

8. From testimony taken on January 20, 1984, it appears that the lending institution, namely, the Alabama National Bank of Montgomery, took a mortgage for two years, and that the first installment of interest is to be paid within 6 months after the closing. The Alabama National Bank loaned 100% of the purchase price, that is $340,000.00 in connection with the purchase of this property by Swanee River Pecan, Inc.

9. Bill Fowler Realty Company has already undertaken, or will undertake shortly to sell off a portion of this property or to lease a portion of it, and the participants in this purchase by Swanee River Pecan, Inc., that is, the Messrs. Hodges and Bill Fowler, each owning 50% of the corporation, will undertake to dispose of this property. From the testimony, the Court concludes that such disposal is to take place within two years, for the purpose of servicing that mortgage to the Alabama National Bank.

10. The testimony of Fowler also supports a finding that the property, in an appropriate offering, is worth $380,000.00 to $420,000.00, and that he, as sole trustee's agent, obtained a purchaser for $340,000.00 for this estate.

11. His testimony is, further, that the check by which the trustee in this case paid Bill Fowler Realty Company its real estate commission, (check No. 144) was endorsed by W.R. Fowler, and immediately deposited to the account of the Swanee River Pecan, Inc., a fact which Mr. Fowler initially denied during examination. Fowler and the Messrs. Hodges each have a right to draw out any or all of that money from the Swanee River Pecan Company account.

## CONCLUSIONS

12. The conclusion from these facts is that W.R. Fowler, or Bill Fowler Realty Company, held and does hold an interest adverse to the interest of the estate, with respect to the very matter on which he was employed.

13. Many of the factors which we have outlined above, in and of themselves, would not constitute Mr. Fowler as an interested party or burden him with an adverse interest. He did seek and find a purchaser or purchasers for the property. The fee is not unreasonable. He is moreover entitled to do with his money, once earned, whatever he wishes, so long as it remains his money, and so long as he does not take an adverse position to the estate.

14. But when he has become an owner of the purchaser of this property, and had not fully divulged that to the trustee, and has further, in effect, made a rebate or kickback to the purchaser of a part of the purchase price, in the amount of $20,400.00, and he knew before the consummation of the sale that he would be in a position to sell or resell or lease this property, and to manage it for the purchaser to his own benefit, no matter how contingent that benefit might be, then he has obtained an interest adverse to that of the estate.

When we place, with these facts, his own testimony that the property, when properly offered, would be worth at least $380,000.00, or approximately $40,000.00 more than the trustee was able to realize by this realtor's efforts, and when we consider that the arrangements with the Alabama

National Bank anticipate a quick turnover of this property, at a profit to the purchaser and its beneficial owners, then we are left with no alternative. We are obliged to require the return of that fee to the estate.

And it is of little consequence that trustee may have known of the possible interest of Fowler in the purchasing corporation. His knowledge, even his assent, to that interest cannot change the fact that there was an adverse interest, which is condemned by Federal law.

15. We are reinforced in this conclusion by an examination of the Criminal Code of the United States relating to Bankruptcy. Title 18, U.S. Code, Section 154, reads as follows:

> Section 154. *Adverse Interest* and Conduct of Officers [Emphasis supplied]. Whoever, being a custodian, trustee, marshal or other officer of the court, knowingly purchases directly or indirectly any property of the estate of which he is such officer in a case under Title 11 ... shall be fined not more than $500.00, and shall forfeit his office which shall thereupon become vacant.

16. While this is not a criminal case, we think this criminal statute, modified by the Bankruptcy Act of 1978 to read as above, aptly defines adverse interest and that the facts in this case exactly fit that definition.

17. Mr. Fowler was an officer of the court. He knowingly purchased, albeit indirectly, property of the estate. He therefore had an adverse interest.

18. See generally *Collier on Bankruptcy*, 15th Edition, Vol. II, Paragraph 327.-03[f], on page 327–16, *et seq.*

See also, *Matter of Frazin and Oppenheim*, (C.A. 2) 181 F. 307; *Matter of Stephens and Co.*, (D.C.Cal.) 30 F.2d 725; *Report of Legislative History of the 1978 Code*, (H.R. 95–595, p. 328); *Woods v. City National Bank and Trust Co.*, (1941) 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, rehearing denied 312 U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145. *In re 765 Associates*, (1981) (Bkrtcy.D.C.HI.), 14 B.R. 449, 8 B.C.D. 200, in which the Court required an attorney to

return any compensation already received where he represented the estate and had a conflict; *Re Codesco, Inc.*, (1982, Bkrtcy.S.D.N.Y.) 18 B.R. 997, 8 B.C.D. 1293; *Re Perry, Adams & Lewis Security, Inc.*, (1980 Bkrtcy.W.D.Mo.) 5 B.R. 63. These latter cases condemn even the appearance of disinterestedness and further condemn any opportunity for the exercise of conflicting interest or the appearance that dual loyalty may exist.

An appropriate Order will enter.